UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------X
                             :
UNITED STATES OF AMERICA,    :
                             :   21-CR-563 (EK)
          v.                 :
                             :   January 5, 2022
ROGELIO VEGA,                :
                             :   Brooklyn, New York
             Defendant.      :
                             :
-----------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:         BREON PEACE, ESQ.
                           U.S. ATTORNEY
                           BY: PATRICK CAMPBELL, ESQ.
                           ASSISTANT U.S. ATTORNEY
                           271 Cadman Plaza East
                           Brooklyn, New York  11201


For the Defendant:          JAMES DARROW, ESQ.
                           Federal Defenders of New York
                           One Pierrepont Plaza, 16th floor
                           Brooklyn, NY 11201




Court Transcriber:          ARIA SERVICES, INC.
                           c/o Elizabeth Barron
                           274 Hovey Road
                           Milo, ME 04463
                           Aria@leinen.net



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1            THE CLERK:  Criminal cause for bail

2    application, U.S.A. v. Rogelio Vega.  The case number

3    is 21-CR-563 and we're doing this bail hearing via Zoom

4    video and audio.

5            May I have the parties state their name for

6    the record?  For the government please?

7            MR. CAMPBELL:  Patrick J. Campbell for the

8    United States.  Good afternoon, your Honor.

9            THE COURT:  Good afternoon.

10            THE CLERK:  Thank you, Mr. Campbell.  And

11    for the defendant please?

12            MR. DARROW:  Good afternoon.  James Darrow,

13    Federal Defenders of New York, for Mr. Vega.  As you

14    can see, I'm on video link, your Honor, and Mr. Vega is

15    patched in from the MDC by telephone.  I wanted to say

16    we do consent to that.  In light of the lock-down, we

17    wanted to make the bail application as soon as we

18    could.  So in light of the ongoing pandemic and the

19    lock-down, we consent to proceeding in this fashion.

20    Also on the line, your Honor, are a number of proposed

21    suretors.  I don't know whether we have all of them but

22    if we get to that, I can figure that out for your

23    Honor.

24            THE COURT:  All right, thank you, Mr.

25    Darrow.

1            Mr. Vega, can you hear us okay?

2            THE DEFENDANT:  Yes.

3            THE COURT:  Your lawyer said that it's okay

4    with you for us to proceed even though we're on video

5    and you're on audio, so you can't see us but you can

6    hear us.

7            THE DEFENDANT:  Yes.

8            THE COURT:  Is that okay with you?

9            THE DEFENDANT:  Yes.

10           THE COURT:  All right, so let's proceed

11   then.  I understand that Mr. Vega was before the Court,

12   he did not have a bail package and he was detained.

13   I've seen that there's a detention memo that the

14   government filed with an addendum.  There was also an

15   update to his bail or the Pretrial Services report

16   because it sounds like there were some state charges

17   that have now been resolved.

18           So let me hear first from Mr. Campbell, if

19   you want to add anything to your detention memos.

20   Also, I'm interested in understanding the sequence of

21   the events that are at issue here and also in the state

22   case, because I don't have a clear picture of the

23   things that Mr. Vega has admitted to doing in the state

24   case and then, also, what he's alleged to have done

25   here.

```
 1              MR. CAMPBELL:  Yes, your Honor, thank you.
 2    So let me start there with the factual issues and the
 3    state case.  My understanding is that he was arrested
 4    in January of 2021 by the NYPD as the result of an
 5    undercover operation where the defendant was
 6    communicating with who he believed to be a fourteen-
 7    year-old boy, solicited the individual for sexually-
 8    explicit images and to meet up for sexual acts.  Then
 9    Mr. Vega was arrested as part of a sting because the
10    undercover officer arranged to meet him and he did meet
11    him.  Those charges were disposed of in October of
12    2021.  The defendant pled guilty to the state charge.
13    He was sentenced -- I believe yesterday, he was writted
14    out to state court to be sentenced.  The sentence in
15    that matter was ten years' probation.  He as a result
16    is subject to probation conditions.
17              And one thing to add to the government's
18    submission is that in addition to the issues raised
19    with the potential Florida residences, it's my
20    understanding from speaking to Pretrial that his
21    probation under the New York State conviction would
22    prohibit an immediate relocation to Florida.  He would
23    have to go through a process where he applies for
24    relocation, he would have to be approved for relocation
25    before that would be an option, in addition to the
```

1    other reasons set forth in the detention memo.

2            As to the facts of this case, as a result of

3    the defendant's January 21 arrest for the state charge,

4    the government seized a number of cell phones from him.

5    The government applied on the federal level for search

6    warrants to search those phones and recovered

7    communications with a number of victims going back to

8    2015.  The government's charges cover the period from

9    2015 through January, 2021, when the defendant was

10   arrested on state charges.  Those are detailed in one

11   of the victims (ui) in the complaint.  The grand jury

12   has returned an indictment charging him with five

13   charges, three of enticement of minors, one of

14   possession of child pornography, and one for

15   production.

16           I believe that answers the questions that

17   your Honor had.  I'm happy to go through what's in the

18   detention memo but to the extent that you've read it,

19   we're also happy to rely on that.

20           THE COURT:  All right.  You don't need to

21   repeat it but I understand that this is a presumption

22   case.  You said that he's also now facing a mandatory

23   minimum of a sentence of fifteen years if he's

24   convicted on the most serious charge?

25           MR. CAMPBELL:  That's correct, your Honor.

```
1              THE COURT:  Can you tell me, and perhaps Mr.

2    Darrow might know more details about the conditions of

3    the defendant's probation and whether there are --

4    other than not being able to live in Florida, if he

5    were to live in New York, whether there are things that

6    the Court should be aware of in trying to fashion the

7    proposed bail package here to comply or to fit together

8    with the probation.

9              MR. CAMPBELL:  Your Honor, I can make an

10   attempt.

11             THE COURT:  Okay.

12             MR. CAMPBELL:  And Pretrial may as well have

13   additional information because they have been in

14   communication with the probation and supervision on a

15   state level.  My understanding is that he is subject to

16   registration.  He was I believe classified by the

17   Court.  I don't know what his conditions -- what his

18   classification is and what conditions were imposed with

19   respect to that, except for the fact that he would not

20   be eligible to immediately move on his own volition out

21   of state.  He would need to approve it through his

22   state probation and go through the state process.  But

23   other than that, your Honor, I just don't know what his

24   conditions are.

25             THE COURT:  Okay.  Mr. Darrow, before I turn
```

1    the floor over to you, I also am interested in

2    understanding based on your proposal what access to

3    electronic devices your client would have and then also

4    his proximity to minors.

5            MR. DARROW:  Your Honor, I can address those

6    things.  Does it make sense for the record for me to

7    make clear what my proposal is in specifics, and then I

8    can go through each of those concerns.  Does that make

9    sense?

10           THE COURT:  Yes, it does, go ahead.

11           MR. DARROW:  Okay.  So we're prepared that

12   Mr. Vega be released to home confinement with

13   electronic monitoring.  In the first instance, at his

14   prior residence, the Maspeth home of his daughter

15   Carmen, who is on the line, with a $250,000 bond,

16   although the government makes note in its supplemental

17   submission and says that in its view, that amount is

18   too low given the high number of suretors we've

19   proposed, we're happy to have that increase.  We're not

20   tied to that amount.

21           Normally, what I do, your Honor, is I try to

22   add up folks' yearly income.  If I did the math wrong,

23   that's my fault, so we can increase that amount if it's

24   warranted.  It would be secured with the residential

25   property of my client's father, who has the same name,

1  where we understand there's $66,000 of equity in that

2  home in Georgia.  And as I mentioned, a total of seven

3  potential co-signers, all of whom I believe were

4  interviewed by Pretrial and maybe the government.  It

5  would be the Adam Walsh Act conditions that apply

6  mandatorily, including full surveillance of any

7  internet electronic devices.

8            Regarding the residence, the two issues that

9  your Honor raised -- regarding the minor children,

10  those are the children of Carmen Vega, whose home it is

11  and whose on the phone.  She has been advised of the

12  charges and has consented to his presence.  I'll note

13  that there's no allegation of harm to minors so young.

14  The alleged victims here were teenagers.  But if the

15  Court believes that that is a problem, that Ms. Vega,

16  Carmen Vega, her judgment should be superseded, then we

17  see two solutions:

18            One would be for my client to reside in any

19  of the other suretors' homes in Florida.  They have all

20  consented to that or most of them have consented to

21  that, and we would be happy to investigate the

22  logistics of that if the Court wants.  We haven't yet

23  investigated what each one of those possibilities would

24  be but I would be happy to do so and then come back to

25  the Court.

1          I'm hearing for the first time -- I wasn't

2    aware that there was a relocation condition because I

3    also wasn't aware of the details of the sentence

4    imposed yesterday until this morning.  But of course,

5    Mr. Vega it sounds like would have to go through that

6    process.  But if you were in any event investigating

7    logistics, we would be going through an investigatory

8    process in any event, so I think that collapses into

9    the same issue.

10         But the other possibility, your Honor, if

11   your Honor has concerns about the minor children that

12   aren't alleviated through the proposed package, and for

13   reasons I'll explain, we don't think there should be

14   those concerns.  But if there are, then another

15   possibility we understand is for Ms. Vega, Carmen

16   Vega's home to potentially be converted so that the

17   client's floor would have its own separate entrance.

18   Again, we haven't gone into detail about how much time

19   that would take or what would fully be involved, but I

20   gather that in theory, that is at least a possibility,

21   so it's something we could explore if necessary.

22         I do want to note regarding our alternative

23   proposal that the client live in Florida, the

24   government's detention memo suggests that his presence

25   there would I guess constitute a severance of his ties

1  to the community.  But the truth is, the opposite is

2  the case.  He would be closer to his elderly father,

3  who lives in Georgia, and he would be surrounded by

4  most of the suretors who we are proposing.  So we

5  believe that his presence there would involve strong

6  ties to the community.

7          I guess I should back up and make clear our

8  larger point, which is that the question is not only

9  the severity of the alleged conduct or whether Mr. Vega

10 presents a risk of flight or danger to the community at

11 all.  It's not.  It's whether he presents a danger or a

12 risk of flight under the conditions that we're

13 proposing.  And in that regard, we believe it's

14 substantial evidence, which we are obliged to put

15 forward in a presumptive context, but we believe it's

16 substantial evidence that he was previously released on

17 bail in state court after -- and was released after

18 having pled guilty to a related offense to one of those

19 charged here.

20         I'll note that the other currently charged

21 offenses, as the prosecutor just made clear, are

22 alleged to have preceded that state conduct and

23 apparently only came to light after the government

24 searched my client's devices in connection with the

25 state case.  So I don't believe there's any allegation

1   of any offense occurring while my client was under

2   supervision, and the fact that the sentence that the

3   state judge saw fit to impose was probation is hardly a

4   sentence for someone who had been adjudicated by that

5   authority at least to be a risk of flight or a danger

6   to the community.  In fact, another judge has

7   considered at least some of these facts and determined

8   that supervision was adequate, which we believe is

9   powerful and persuasive evidence that he wouldn't be a

10  danger to the community under the supervision

11  conditions we've proposed.

12          The government in the detention memo refers

13  to the charged offense conduct as incredibly serious

14  and makes much of the applicable mandatory minimum, but

15  it overstates the matter.  The detention memo says that

16  a mandatory minimum of the count here flatly means that

17  no combination of conditions can assure a defendant's

18  appearance, but that's not the law.  It's not what the

19  cases that the government cites say, and the purpose of

20  the Adam Walsh Act, which applies in this case just as

21  it does in other incredibly serious mandatory minimum

22  cases involving child victims, is to set appropriate

23  bail conditions in just such a context.  The Act

24  wouldn't exist if each one of those charges always

25  required detention.

1          The question here is, just as it is in
2     another case, whether the danger to the community and
3     risk of flight can be alleviated under the conditions
4     we're proposing.  We are proposing some of the most
5     restrictive conditions that are possible.  Mr. Vega
6     would not be leaving his home, except for extraordinary
7     reasons.  He would have no unsupervised access to the
8     internet and thus no ability to continue to perpetrate
9     the charged offense conduct even if he wanted to.
10          In answer to your Honor's question about
11    devices, the government speaks in its detention memo
12    about other people's devices.  Well, let me back up and
13    say, the usual way this works, as your Honor knows, at
14    least in my experience, is that Pretrial Services would
15    either order removed from the home or would password
16    protect or otherwise lock any fixed internet-capable
17    devices in the home.  So for example, if there was a
18    television that had an internet capability on it, the
19    television would either have to be disabled or removed
20    from the home, or it would have to be password
21    protected.  I say that because I have particular
22    experience with that particular type of device.
23          So for the fixed devices, that's the way
24    that Pretrial does it.  I don't mean to speak for
25    Pretrial.  I'm just giving color in answer to your

1   Honor's question.  And in terms of movable devices,

2   this isn't the first case where that issue has been

3   presented.  Pretrial is well-versed in dealing with

4   that problem.  In my own experience, the solution to it

5   has several options, including prohibiting any such

6   devices from the home entirely, insuring that such

7   devices are password protected and so forth.

8           At bottom, the government speculates that

9   Mr. Vega could for example order a device by mail, for

10  example.  But there's no evidence that Mr. Vega has

11  ever failed to comply with supervision in any respect,

12  let alone in such an extraordinary respect, so there's

13  no evidence that he would do such a thing.  There's

14  always the remote possibility of noncompliance in any

15  bail order but without evidence that such a possibility

16  would happen, that speculation can't control the day.

17  Look, in any event, he would be subject to random

18  search and confined to his home, so he wouldn't be able

19  to avoid detection by mail ordering a phone because it

20  would just be found.

21          The main point, your Honor, is that he has

22  no incentive to do that.  What his incentive to do

23  (sic) is to comply just as he would doing on bail

24  previously, because he needs to show Judge Komitee that

25  he is and can be law-abiding.  He also, it should be

1    mentioned, has the livelihood of seven family members

2    and friends to consider, including the home of his

3    elderly father.  There's an extraordinary outpouring of

4    support here from the people who know Mr. Vega best,

5    which is a testament to his motivation and ability to

6    comply.

7            There are two others matters, too, that I

8    wanted to raise with your Honor relating to his current

9    conditions of confinement.  The first is this:  The

10   bail report notes that Mr. Vega is diabetic and suffers

11   from pancreatitis.  So even before the current Covid

12   lock-down at the MDC, Mr. Vega's blood sugar was

13   extremely high because the insulin that was being

14   provided was being provided at sporadic times, and I

15   have numbers here if your Honor is interested.  But the

16   main point is that his numbers are extremely high, both

17   as to his insulin but also as other chemicals whose

18   name I can't pronounce, which could cause a dangerous

19   reaction in his pancreas.

20           The problem with the current lock-down, your

21   Honor, is that medication is being administered even

22   more sporadically, which puts him in danger even apart

23   from the presence of Covid in the jail.  As your Honor

24   knows, the numbers have skyrocketed.  At last count, I

25   think it was more than 12%, perhaps up to 15% of the

1  total population of the prison is now infected with

2  Covid.  That alone of course for somebody who has a CDC

3  high-risk factor for Covid is a serious problem, but

4  the main issue, your Honor, is that the medical

5  treatment, which the MDC has not covered itself with

6  glory in administering under normal circumstances,

7  poses a real problem to his health now.

8          The other issue relates to the case.  The

9  lock-downs -- currently, as your Honor is aware,

10  attorney visits can't take place in person.  And while

11  we do have the ability to have some hour or hour-and-a-

12  half-long video calls, even that more recently have

13  been unable to take place or be converted to telephone

14  because of problems such as the one we're having now

15  but problems with I take it equipment in the facility.

16          The issue with the case, your Honor, is that

17  the discovery here is voluminous.  It consists partly

18  of extremely voluminous and lengthy messages, internet

19  messages, which we cannot send to Mr. Vega at the

20  facility for security reasons.  What that means is, we

21  have to take them to him and go over them with him

22  together, so that takes a great deal of time.  The

23  government rightly wants to move this case quickly.  We

24  had a plea offer that has already expired because it

25  wants to move the case quickly, but I'm in a position

1  now because of the lock-down where I cannot move this

2  case forward really at all.  So having Mr. Vega at

3  liberty would permit me to go to his house and review

4  the discovery with him, which is just something that

5  just has to happen for the case.

6          So I think those other matters may not move

7  the needle absent anything else.  I'm not suggesting

8  that those things warrant release in and of themselves

9  but I think they're important bail factors to consider

10  along with the other context.

11          THE COURT:  Thank you, Mr. Darrow.  In the

12  state case, if you know, when your client was released,

13  I believe it was a $50,000 bond.

14          MR. DARROW:  That's my understanding as

15  well.

16          THE COURT:  And he made his -- his showed up

17  in court as required.

18          MR. DARROW:  I believe he did.  I have no

19  information to the contrary but my understanding from

20  counsel is that he did.

21          THE COURT:  So I hear all the things that

22  you're saying about the difficulties in getting to MDC,

23  the conditions there and so forth.  I am -- so I'm

24  willing to work with you to see if we can come up with

25  conditions to have your client in the community rather

than confined during this pretrial period.  However, I
am concerned about safety and in a case where the
allegations are about not just possession of child
pornography but also with actual enticing of minors and
sexual acts, I am concerned about the safety of minors
that your client may be in touch with, in contact with.
So the fact that there are minors in the home that
you're proposing he reside at causes me concern, and
I'm not -- I'm not persuaded that just because they're
younger, that somehow they're not at risk.

Obviously, it's very hard to predict what is
likely to happen.  But in this particular area of
criminal charges, I do have concerns about not just the
motivation to comply but not having any temptation,
let's put it that say, where he's in daily contact as
it were with minors such that there could be a problem
and that they would somehow not be safeguarded.  I
appreciate that the mother has made a decision that
it's okay but I would like more to show that they would
not be at risk being in contact with your client, so
can you speak to that issue?

MR. DARROW:  I can, your Honor.  It may be
on us in light of that concern to come back to the
Court once we've had an opportunity to investigate the
logistics of the other options that I outlined, both

1    the possibility of a separate apartment where my client

2    would be living alone and we could have an order

3    barring any children in that apartment, for example, or

4    the possibility of a Florida alternative residence.

5    The latter option, we would have to sort out the

6    probation angle.  I'm confident we could.

7            The government raises an issue that I had

8    not anticipated or didn't fully understand, which is

9    that the government's understanding is that the Middle

10   District of Florida, which the government says and I

11   accept this, I don't know, is the applicable district,

12   does not have the capacity to do electronic monitoring.

13   It seems to me I've had clients who have been monitored

14   electronically by the Eastern District even though they

15   have been in other districts, so I don't know whether

16   that's possible but it is a thing that I could look

17   into as well to try to solve that problem, too.

18           Your Honor, does it make sense for me to

19   take the next week or so to try to investigate those

20   problems and then come back to the Court with a more

21   specific alternative proposal?

22           THE COURT:  I think so, although I would

23   also note that I'm not thrilled about a Florida

24   solution because it is so far away, it's hard to

25   monitor.  And with the state court, you'd have to work

1   out the probation conditions, if it's even possible.

2   It may not be possible because of the supervision in

3   that case.  So if you come back with a package that

4   very clearly addresses these concerns, both the

5   logistics and the safety of minors, and then also the

6   issue of the electronic devices -- I know that in other

7   cases, we have dealt with electronic devices being

8   locked down and things like that.

9            I'm less concerned with him getting new

10  devices and more concerned with him having access to

11  current devices.  Password protection is one thing but

12  I think that's really the only thing that would work

13  here because if he's living with another person, that

14  person is surely going to have other devices, and I

15  don't know that that person would voluntarily give up

16  access to those devices.

17           So it would be twofold, or actually, it's

18  three-fold.  So it would be about not having contact

19  with minors let alone living with them, number one;

20  number two, the access to electronic devices and how

21  safe -- how the Court can be assured that he won't have

22  access to somebody else's devices in his living

23  condition.  The third is, if your only alternative is

24  one that's out of state and you're looking at Florida,

25  then you need to clear up whether it's possible with

1    the state probation and what that would look like,

2    living down there, again his living conditions there

3    and whether it's possible to monitor him in the Middle

4    District of Florida.

5           So there are a lot of different things that

6    I don't have the information for but if you can look

7    into it, I would be open to having you come back.  I

8    don't know logistically whether -- I know I'm raising

9    these concerns but if you come back next week and I'm

10   not on criminal duty, it will be a different judge.

11   I'm going to presume that you'll just have to go to the

12   other judge, but you can present to that judge that I

13   raised these issues and that's what you're addressing.

14          MR. DARROW:  Your Honor, I'm happy to do

15   that if that's what your Honor wants.  I have in the

16   past, when things get complicated like this, just

17   directed the renewed application to the same judge

18   because your Honor has already started with the file.

19   Other judges have accepted that but I'll do what your

20   Honor wants.  I think it would be our preference not to

21   retread ground but I'll do what your Honor wants in

22   that regard.

23          THE COURT:  Mr. Campbell, do you have any --

24   I'm happy to retain it.  If I'm not on duty, I can't

25   guarantee what the timing of my schedule will be so

1    that might be a little more complicated.  But in theory

2    or in concept, Mr. Campbell, do you have a problem with

3    my continuing with the case?  I'm happy to continue

4    with it but I want to get your input.

5              MR. CAMPBELL:  Your Honor, the government

6    does not have an issue.  We agree, for efficiency, it

7    does make sense if your Honor is willing to keep the

8    case for a re-hearing.

9              THE COURT:  Okay.  So why don't we do that

10   and I'll let my deputy know or the magistrate clerks

11   will let me know when this comes up and as the

12   information comes in, it will be relayed to me.  And

13   then through my deputy, we'll set a schedule for a

14   continued bail hearing.

15             MR. DARROW:  Yes, your Honor.

16             THE COURT:  Mr. Campbell, did you have

17   anything you'd like to add?

18             MR. CAMPBELL:  No, your Honor, thank you.

19             THE COURT:  Thank you, Mr. Darrow.

20             Thank you to everybody who has been here

21   today.  We are going to have another meeting at some

22   later point but thank you for your participation today.

23                     * * * * * * *

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                    January 13, 2022